## MUTUAL HOME & SAVINGS ASS'N. v WESTGERDES et

Ohio Appeals, 2nd Dist, Montgomery Co

No 1667. Decided Jan 27, 1941

Thomas J. Herbert, Attorney General, Columbus; William P. Patterson, Dayton, and Joseph H. Colvin, Dayton, for plaintiff-appellant.

Scharrer, Scharrer, McCarthy & Hanaghan, Dayton, for defendants-appellees.

## OPINION

By BARNES, J.

The above entitled cause is now being determined as an error proceeding by reason of plaintiff's appeal on questions of law from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

Plaintiff's petition was filed May 15, 1939. On June 26 following, the Superintendent of Building & Loan Associations of the State of Ohio, by duly journalized entry, was made substitute plaintiff under a showing that the said superintendent had on the 6th day of June, 1939, taken possession of the business, property and assets of the association for the purpose of liquidation pursuant to §§687, 687-1, et seq. GC.

Plaintiff in its petition against the defendants sought personal judgment on a note executed by the defendants to the plaintiff on November 30, 1937, for $2295.00, with interest which was claimed to be past due under an accelerating clause rendering the entire amount due and payable upon nonpayment of two or more monthly installments, all of which was affirmatively set out in the petition.

Under a second cause of action, plaintiff sought foreclosure of the mortgage securing the note.

On October 23, 1939, plaintiff took default decree, the journal entry finding amount due, entering personal judgment and ordering foreclosure.

On October 31 following, the default judgment was opened up and suspended and defendants granted leave to file answer on or before November 6, 1939.

On November 10, 1939, defendants filed an answer and cross-petition, on which summons was duly issued and served. The answer, after admitting certain allegations of the petition, denied all others.

The cross-petition sought damages against the plaintiff in the sum of $1000.00, on the claimed ground that false and fraudulent verbal representations were made by plaintiff to the defendants at the time and before they purchased from plaintiff the premises described in the petition. The deed for the premises was executed November 30, 1937, on the same day that the purchase money mortgage was executed to plaintiff. The purchase price was $2700.00, of which $405.00 was paid in cash and the balance by note secured by mortgage.

The cross-petition further avers that negotiations between the duly authorized representatives and agent of plaintiff and defendants began and continued through the months of September, October and November, 1937. That during the period covered by the negotiations and on November 30, 1937, the following false and fraudulent verbal representations were made by plaintiff to defendants, to-wit:

"That the aforesaid described premises had a front footage of 60 feet and a depth of 150 feet and that located thereon was a well for the domestic use of the purchaser; whereas in truth and in fact said premises had a foot frontage of 50 feet and a depth of 130 feet and that there was no well or water supply on the property described aforesaid, all of which were known to be false by plaintiff at the time they were made and were made for the purpose of inducing the defendants to make the purchase aforesaid; that by reason of said false and fraudulent representations, relying on them and while ignorant of their falsity, defendants purchased from plaintiff on November 30, 1937, the premises described aforesaid, paying therefor the sum of $2700.00, $405.00 as down payment and executing their note and mortgage on the above described premises in the sum of $2295.00 and received from plaintiff their warranty deed conveying to them the aforesaid premises."

To the cross-petition plaintiff filed a motion asking that defendants make their cross-petition definite and certain by stating specifically who the duly authorized representative and agent of plaintiff was who made the

allegedly false and fraudulent misrepresentations.

The trial court sustained the motion but made an alternative provision through which they might inform plaintiff in writing the name and position of said agent or agents.

No amendment was made to the cross-petition, but we assume from statements made in the brief, supported by the bill of exceptions, that the claim was made that the false and fraudulent representations made were by one Hobson, a duly licensed real estate broker within the City of Dayton.

On May 29, 1940, plaintiff filed reply, which was in substance a general denial.

Upon trial to a judge and jury, verdict was returned for the cross-petitioners in the sum of $400.00, following which motion for new trial was duly filed, overruled and judgment entered on the verdict. Within proper time plaintiff gave notice of appeal.

Plaintiff's assignment of errors are set out under four separately numbered and stated specifications:

Assignment No. 1 is subdivided under headings A, B, C, D and E.

Assignment No. 1. The court erred in not granting motion of plaintiff-appellant for a directed verdict.

1-A. Failure of proof of agency.

1-B. Contract should have been interpreted by the court.

1-C. Appellees made no effort to determine the authority of Hobson.

1-D. The Association as principal can not be held to have ratified the statements of Hobson for want of knowledge.

1-E. Before instituting their action for damages the defendants-appellees should have offered to deed the property back to the Association and demand that the sale be avoided and have them placed in status quo.

Assignment No. 2. Refusal of the court to give Special Charge No. 1, requested by the plaintiff before argument.

· Assignment No. 3. Refusal of the court to give Special Charge No. 2, re-

quested by the plaintiff before argument.

Assignment No. 4. Refusal of the court to give Special Charge No. 3, requested by the plaintiff before argument.

There is very little controversy on any of the questions of fact. As we view the record, it presents exclusively a question of law.

The following narrative of uncontradicted facts is presented through the bill of exceptions:

The real estate was described in the deed and mortgage as follows:

"Situate in the Township of Randolph, County of Montgomery, in the State of Ohio, and described as follows: Being Lot Number Eight (8) on the plat known as Upper Main Street Plat, being a subdivision of 38.51 acres of land in Section 25, Township 5, Range 5 East, etc., made by Gustav Becker and recorded in Plat Book "R", page 38, Montgomery County, Ohio, Records."

Defendants-cross-petitioners were first attracted to the above described premises through an ad appearing in the Dayton Daily News, under date of September 24, 1937, as follows:

"Mutual Home Offerings. Here are some suburban homes that are good buys. The following are located on Covington Pike, immediately north of the old Salem Road, seven miles from the center of Dayton and numbered as follows. (Then follows a short description of 18 properties.) (The one involved was described as follows): No. 8, Upper Main Street, six rooms, bath, modern, garage, $2700.00. (Then at the bottom of the ad the following): See your broker. Mutual Home Savings & Loan Association, 112 West Second St., Fulton 6177."

The defendant-cross-petitioners, after reading the above ad and within a day or two, went to see Mr. Hobson, who was a licensed real estate broker in the County of Montgomery. Both

Mr. and Mrs. Westgerdes testified that they had not previously known Mr. Hobson, nor had they had any business dealings, either directly or indirectly, with him. Their explanation for going to Mr. Hobson was that they had noticed his ad in the paper, listing low priced properties for sale.

When the defendant-cross-petitioners went to see Mr. Hobson they asked him about this property, "No. 8 on Covington Road", and if he had it. Mr. Hobson gave an affirmative answer and pulled out a folder containing descriptive memoranda of a great number of properties that the Mutual had for sale. Defendants wanted to go through the premises and Mr. Hobson wrote out on a card a request that the bearers be permitted to examine the property and go through the house. This was to be presented to the then tenants. After examining the property, as per their request, defendants continued their negotiations with Mr. Hobson, first asking if he could procure for them a price of $2500.00. Mr. Hobson agreed to find out and later reported to them that the Mutual would not sell for less than $2700.00. During some one or more of these interviews, defendants both testified that Mrs. Westgerdes inquired as to the size of the lot and also as to whether or not the well was on this lot. Both testified that Hobson gave them the dimensions of the lot as 60x150, and further that the well was on this lot.

Defendants finally made up their minds that they would purchase the property and then, together with Mr. Hobson, went to the office of The Mutual Home & Savings Association.

At this meeting Mrs. Westgerdes signed a paper which was headed "Offer to Purchase," and which was dated November 1, 1937. This paper contained a description of the property, the price to be paid, terms of payment, provisions concerning taxes and insurance, provided for the payment of $100.00 as guarantee of good faith, the proposition to be submitted to the directors of the Association for acceptance, and if accepted deed to be delivered on or before November 30, 1937.

On the back of this document there appears the following:

"ACCEPTANCE
Dayton, Ohio, 11/12, 1937.
The foregoing offer is hereby accepted for the purchase of the within described property, and upon the terms and conditions therein stated, and The Mutual Home & Savings Association, of Dayton, Ohio, will pay to George Hobson a fee of $108.00 as commission for services rendered in this transaction if, and when said sale is consummated.

THE MUTUAL HOME &
SAVINGS ASSOCIATION,
Witnesses        of Dayton, Ohio,
R. K. Huber      By W. G. Grieser,
General Manager."

At the time of the signing of the "Offer to Purchase," Mrs. Westgerdes said that she again inquired as to the dimensions of the lot and the location of the well, and that Hobson again repeated to her the same as previously.

On November 30, 1937, the deal was closed by the plaintiff executing and delivering its deed to the defendants, the latter paying the remainder of their cash payment and executing and delivering a note and mortgage and shortly thereafter taking possession and moving into the residence.

On the same day that the deal was closed, to-wit, November 30, 1937, the Mutual gave to George Hobson its check for $108.00, which was duly cashed.

The defendants further testified that at the time of the closing of the deal and making out the final papers, Mrs. Westgerdes again inquired about the well, and that Hobson reaffirmed his former statement that the well was on the lot.

The defendants kept up their monthly payments as per the terms of their mortgage note, until December 29, 1938, when payment was stopped on advice of their counsel.

Defendants claim that they had no knowledge of the falsity of the repre-

sentations made by Hobson until November 11, 1938, when, at the instance of a neighbor, he being uncertain as to their lot lines, suggested that they go together and have a survey made, which was done, and the surveyor's report, made on November 11, 1938, disclosed to them that their lot was only 50 feet wide and 130 feet in depth, and that the well, instead of being on their lot, was six inches to the north of their lot.

The record is silent as to whether or not the boundary lines, either front, back or on the sides, were indicated by any monuments, fences, alleys or otherwise, except, of course, we assume the street line marked the front boundary.

The well in question at all times furnished water to the premises in question, but it was also used by the occupants of the residence property immediately north. Pipes from the well were visible and went over to this lot 8.

Following this discovery through the survey, defendants then made complaint to the plaintiff Association.

In the interest of adjusting their complaint, the plaintiff had procured from the title owner of the lot upon which the well was located, an easement grant for the use of water from said well. This the defendants refused to accept, although it appears from the evidence that they are still using the water from the well.

Mr. Hobson, the real estate broker, was not called as a witness. This may be explained by the fact which crept into the record at the time of the trial he was either in jail or in the penitentiary.

The evidence of the defendants as to the claimed representations made by Mr. Hobson regarding the dimensions of the lot and concerning the well, is in no way controverted. Neither does the record present any contradictions to the claim that such representations as made were untrue. In other words, the lot in fact is 50x130, and not 60x150, as represented by Hobson. Furthermore, there is no evidence contradicting defendants' claim that

the well is in fact six inches over on the lot immediately north.

The claim is made that the agents and representatives of the plaintiff Association who participated in the closing of the deal knew that Hobson had made the representations relative to the dimensions of the lot and the well. This is sought to be shown through the testimony of the defendant-cross-petitioners, wherein they gave testimony that Mrs. Westgerdes made this same inquiry that she had previously made of Hobson in the presence of these representatives of the Association. The evidence falls short of bringing this information home to the representatives of the Association engaged in closing the deal. The mere fact that she asked the question and Hobson answered it, does not leave any inference that the other persons present heard it. She does say that they were all there in that room, but fails to give their relative locations, opportunity to hear, tone of voice, or such other essentials as would warrant an inference that they did hear.

Each of these witnesses, when they took the stand, said they had no recollection of such inquiry having been made. One of the witnesses did say that it was possible that the inquiry might have been made and he had forgotten it, but even this falls short of proper proof.

The defendant-cross-petitioners present no evidence as to the agency of Hobson, other than what he himself said as heretofore narrated, and the further fact that the Association gave him a check for $108.00 in furtherance of its agreement so to do under its acceptance of defendant, Mrs. Westgerdes' "Offer to Purchase" and the agreement to "pay to George Hobson a fee of $108.00 as commission for services rendered in this transaction if and when said sale is consummated."

The plaintiff in its testimony presents the uncontradicted evidence that in 1937, due to the depression, the Association had been compelled to take in a great number of properties, estimated at 1000 to 1600, and that it was

a part of the plan of the Association to resell these properties.

In furtherance of this effort they had protographs taken of each and every property which were posted on a card, under which appeared rather full descriptive data, including sale price, of the particular property represented by the photograph. These were massed together according to their location in the city and made up six volumes which were placed on the corridor counters for examination and inspection of the general public who might be interested in purchasing. In addition, this same data was placed in the hands of all licensed real estate brokers within the county, but so far as the record discloses, no contract for exclusive sale or special listing was made with Mr. Hobson or with any of the other one thousand licensed real estate brokers doing business in Montgomery County.

Under the law it is the obligation of the defendants to prove not only that Hobson was the agent of the plaintiff Association but the extent of his authority, or at least to the point that he was authorized to make the alleged false representations upon which the cross-petitioners' action is predicated. This principle is clearly announced in the case of **Spengler v Sonnenberg** et **88 Oh St 192.** Syllabus 1 reads as follows:

"1. In a proceeding to enforce specific performance of a written contract for the sale of real estate, signed by an agent under express authority, it must be shown that the authority was such as to permit the making of the identical contract sued on, and not one differing therefrom in a material respect."

Also see **Volume 1, O. Jur., (Agency), §26, page 659.**

Another proposition of law universally upheld is that agency may not be shown through the declarations of the claimed agent.

**Storage Company v Cox, 74 Oh St 284, 292;**

**Kraus v The Cincinnati Tobacco Warehouse Co., 16 Oh Ap 468.**

There is a very serious question as to whether Hobson was in any sense an agent of the Association at any time. We probably can and will indulge the presumption that by reason of the fact that he received a compensation from the Association that he did have a limited authority to find a purchaser. Most assuredly the record presents nothing, either directly or from which any inference could arise, that he was authorized to make representations as to the dimensions of the lot or the location of the well. The plaintiff Association did not hold him out through its advertisement as their representative. The advertisement placed in the Dayton Daily News by the Association, which the defendants saw and acted upon, did not request that they see their broker, but requested "that you see your broker." Defendants seek to controvert any argument that Hobson may have been their broker through their testimony that they went to see him because of his ad in the paper, but they do not give any evidence of any conversation with him relative to the properties he had listed, but at once made the inquiry as to this Lot 8.

Persons dealing with a real estate broker have no right to assume that he has unlimited authority, but under the law they are bound to ascertain the nature and extent of such authority.

For a full understanding of this principle, it is well to read not only the syllabus but the entire opinion in the Spengler v Sonnenberg case, cited above.

Another very vital question presented through the brief of counsel for plaintiff, is that under the situation presented through the pleadings and the bill of exceptions, defendants may

not bring an action for damages without first offering to deed the property back and the sale be avoided and they placed in status quo.

We find nothing in Ohio bearing directly upon this question, but it seems to be the rule supported by the great weight of authority in other jurisdictions.

We can see merit in this rule for the following reasons:

A property sold to a purchaser may have the full value as represented by the purchase price, and yet to permit the purchaser to recover damages because of some claimed misrepresentation of an agent and permitting them to keep the property would confer an unwarranted advantage. To require the purchaser to tender back and avoid the sale, if such offer is declined by the seller, would constitute a ratification of the claimed misrepresentations and would then warrant an action in damages.

The case of Light v Chandler Improvement Company, 261 Pacific, (Ariz.) page 969, also reported in 57 A. L. R., is a very interesting and well considered declaration of this principle of law. This reported case is almost on all fours with the instant case, and is authority for the principle as set out in Syllabus No. 6:

"Purchaser of real estate, on discovering fraud of real estate broker in representing land, may either ratify transaction as to owner and make payments, reserving right to sue agent, or may offer to rescind, in which case owner, if he insists on holding purchaser to his bargain, will be deemed to have ratified alleged representations of agent."

Under the plan of publication by A. L. R., a leading case is selected, which is quoted in full and thereafter appear annotations from the same or other jurisdictions bearing on the question. We find under the annotations numerous cases in line with the principle announced in the above quoted Syllabus 6. Rather than quote from the annotations, we make reference to the volume, starting on page 111.

The defendants in the instant case were interrogated and admitted that they made no offer to reconvey.

Under the state of the record and in the light of the legal principles announced, we arrive at the conclusion that the trial court was in error in not directing a verdict in favor of the plaintiff against the defendants, and for that reason we entered final judgment for the plaintiff, dismissing defendants' cross-petition and awarding costs.

The statute provides that a reviewing court shall pass upon all errors, and hence we must make some reference to assignments Nos. 2, 3 and 4.

Each of these refers to the refusal of the trial court to give requested instructions before argument. Even if we find these assignments well founded, or even should find no error, such a determination would not affect our final determination. If the court was in error in refusing to give such special requests, either one or all, it would only be the predicate, if prejudicial, for ordering a new trial. We might say that if it should be determined that we were in error in our conclusions that the court committed prejudicial error in not directing a verdict, we still, under our fixed understanding of the law, would hold that the court committed prejudicial error in not giving the special requests before argument. This conclusion may be somewhat anomalous because we are basing it on our fixed conclusion that we should enter final judgment upon principles applicable to all assignments of error.

Entry may be prepared, giving **final** judgment and for costs.

HORNBECK, PJ., concurs.
GEIGER, J., dissents.